Filed 12/30/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOBS & HOUSING COALITION et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>    Defendant and Appellant. | A158977<br><br>(Alameda County<br>Super. Ct. No. RG19005204) |

A group of Oakland citizens placed a proposed special parcel tax on the November 2018 ballot (Measure AA), and officials with appellant City of Oakland (City) prepared ballot materials, which included statements that the measure needed two-thirds of the vote to pass.  After Measure AA received 62.47 percent of the vote, the Oakland City Council determined that only a majority of the vote was actually needed for passage, and it declared the measure enacted.  A coalition of stakeholders brought this postelection, reverse-validation action against the City, seeking to invalidate the enactment.  The trial court ruled in favor of the coalition on its motion for judgment on the pleadings, finding that Measure AA failed because it needed, but had not secured, two-thirds of the vote.  The court also found that the enactment of the measure based on less than a two-thirds vote of the

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A. and II.C.

1

electorate would amount to a "fraud on the voters" because the ballot materials had stated a two-thirds vote was needed.

We reverse. In the nonpublished portion of our opinion, we join our colleagues in Divisions Four and Five of this court, and in the Court of Appeal for the Fifth Appellate District, in holding that a citizen initiative imposing a special parcel tax, such as Measure AA, is enacted when it receives a majority of the vote. In the published portion of our opinion, we further hold that Measure AA cannot be invalidated on the basis of the ballot materials' voting-threshold statements because the statements did not concern the measure's substantive features, were not alleged to be intentionally misleading, and cannot override the law governing the applicable voting threshold.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

We recount the facts as they were alleged in the complaint.[1] A group of Oakland citizens submitted a petition to place an initiative on the November 2018 ballot to approve a parcel tax to fund programs for early childhood education and college readiness. The initiative appeared on the ballot as Measure AA, seeking to add "The Children's Initiative of 2018" to the City's charter.

The official ballot materials prepared by the City Attorney's Office stated the measure was for a "special parcel tax" and that a two-thirds vote

---

[1] In reviewing a trial court's ruling on a motion for judgment on the pleadings we, like the trial court, accept as true a complaint's factual allegations and give them a liberal construction. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516.)

2

was necessary for it to pass. The City Auditor's analysis likewise stated the measure would go into effect "if adopted by two-thirds of voters."

A majority of Oakland voters, 62.47 percent, voted in favor of Measure AA in the November 2018 general election. Although the measure fell short of two-thirds approval, the Oakland City Council declared that the measure had nonetheless passed (Elec. Code, § 15400). The council's resolution declaring the passage of Measure AA suggested that uncertainty had arisen whether a majority or two-thirds vote was necessary. The resolution listed five other measures that had passed, and after each of their "yes" vote totals, the resolution stated, "(Passed)." By contrast, following the "yes" vote totals for Measure AA, the resolution stated, "(Passed/Fail)," with the word "Fail" having been struck out.

Respondent Jobs and Housing Coalition is a nonprofit business advocacy group. It along with others who would be subject to the tax filed this reverse-validation action (Code Civ. Proc., § 863) against the City to invalidate Measure AA as an illegal special tax because it had not received two-thirds of the vote supposedly required by Propositions 13 and 218. According to the complaint, the City Council's action appeared to be an "attempt[] to exploit speculation surrounding" a 2017 Supreme Court decision, *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924 (*California Cannabis*). Respondents also alleged that by declaring after the election that the measure passed by majority vote when the ballot materials had stated a two-thirds vote was needed, the City engaged in a "post hoc bait-and-switch" that "create[d] a patent and fundamental unfairness that amount[ed] to a violation of due process." Finally, respondents alleged that the City and supporters of Measure AA were

3

estopped from claiming after the election that less than a two-thirds voting threshold governed its enactment.

Respondents also named as defendants "ALL PERSONS INTERESTED in the matter of Measure AA." (Code Civ. Proc., § 863.) After no interested party responded to the complaint following service by publication, the trial court entered a default judgment and ordered that interested-person defendants were barred from contesting the claims in the validation complaint.

Both sides (the City and respondents) filed motions for judgment on the pleadings. The trial court first granted respondents' motion. It concluded that Propositions 13 and 218 mandated a two-thirds vote to pass Measure AA. It further concluded that the City was barred from enforcing the measure because voters had been told that passage required a two-thirds vote, and allowing the measure to go into effect with fewer votes would amount to "a fraud on the voters" under *Hass v. City Council* (1956) 139 Cal.App.2d 73, 76.

The trial court then denied the City's motion for the same reasons it granted respondents' motion. In its order, it also concluded that respondents had adequately alleged a cause of action for equitable estoppel because, had they known before the election that the City would take the position after the election that Measure AA needed only a majority of votes to pass, they could have exercised a preelection remedy to challenge the ballot materials' voting-threshold statements.

The City appealed from the subsequent judgment declaring Measure AA invalid and permanently enjoining the City from enforcing it. The Council on State Taxation filed an amicus brief in support of

4

respondents, and two official proponents of Measure AA filed an amicus brief in support of the City.

## II.
### DISCUSSION

We review de novo the trial court's order granting respondents' motion for judgment on the pleadings and denying the City's motion for judgment on the pleadings. (*Gerawan Farming, Inc. v. Lyons, supra*, 24 Cal.4th at p. 515; *Estate of Dayan* (2016) 5 Cal.App.5th 29, 38–39.)

### A. *As a Citizen Initiative, Measure AA Needed a Simple Majority Vote to Pass.*

#### 1. General Overview.

The California Constitution contains the people's initiative power "to propose statutes and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a).)[2] The initiative power likewise "may be exercised by the electors of each city or county." (Art. II, § 11, subd. (a).) Since the power was added to the state Constitution in 1911, "courts have consistently declared it their duty to ' "jealously guard" ' and liberally construe the right so that it ' "be not improperly annulled." ' " (*California Cannabis, supra*, 3 Cal.5th at p. 934.) "A defining characteristic of the initiative is the people's power to adopt laws by a majority vote." (*City and County of San Francisco v. All Persons Interested in Matter of Proposition C* (2020) 51 Cal.App.5th 703, 709 (*Proposition C*).)

Though citizens have long had the power to place tax initiatives on the ballot as they did here, the general power to raise taxes has been restricted through further amendments to the Constitution. The question presented

---

[2] All unspecified references to articles are to the California Constitution.

here is how those amendments affect, if at all, the ability to pass a special[3] parcel tax by majority vote.

The first significant amendment restricting the power to impose property taxes was Proposition 13, which was passed in 1978 and added article XIII A of the California Constitution. (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 248–249 (*Kennedy Wholesale*).) Under section 3 of that article, "[a]ny change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature." (Art. XIII A, § 3, subd. (a).) In *Kennedy Wholesale*, our Supreme Court rejected an interpretation of section 3 as granting the Legislature the exclusive power to raise taxes. (*Kennedy Wholesale* at p. 249.) Thus, Proposition 13 did not limit the people's initiative power to raise taxes. (*Kennedy Wholesale*, at p. 253.)

In 1996, five years after *Kennedy Wholesale* was decided, voters passed Proposition 218, which added articles XIII C and XIII D to the California Constitution. (*California Cannabis*, *supra*, 3 Cal.5th at pp. 936, 939.) " 'Proposition 218 allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge. (Cal. Const., art. XIII D, § 3, subd. (a)(1)-(4); see also [*id.*], § 2, subd. (a).)' " (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 837.) The proposition made clear what Proposition 13 did not, that a local government could impose a special assessment only with a two-thirds vote. (*Apartment Assn.* at pp. 836–837;

---

[3] A special tax is one whose proceeds are earmarked for a specific project or purpose, as opposed to a general tax, whose revenue goes into a general fund for general governmental purposes. (*Johnson v. County of Mendocino* (2018) 25 Cal.App.5th 1017, 1028.)

art. XIII C, § 2, subd. (d).)  As for general taxes, article XIII C, section 2, subdivision (b) provides that "[n]o local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote" at a "regularly scheduled general election."  *California Cannabis* held that this limitation on "local government" did not restrict the ability of *citizens* (as opposed to governmental entities) to impose taxes by initiative and that such an initiative may thus appear on the ballot at a special election.  (*Id.* at pp. 930–931.)

This case implicates three different sections added by Propositions 13 and 218:  article XIII A, section 4 (Proposition 13); article XIII C, section 2, subdivision (d) (Proposition 218); and article XIII D, section (3), subdivision (a)(2) (Proposition 218).  Respondents argued, and the trial court agreed, that under those provisions Measure AA failed to pass because it did not receive two-thirds of the vote.  The City maintains that while these provisions prohibit local governments from imposing special parcel taxes through initiatives that receive less than a two-thirds vote, they do not restrict the power of citizens to impose on themselves such taxes through initiatives that receive a simple majority vote.

Since the trial court issued its ruling, our colleagues in Division Four analyzed the relevant provisions and adopted the City's position.  (*City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058 (*Proposition G*); *Proposition C, supra*, 51 Cal.App.5th 703.)  We now join with our colleagues in Division Five of this court and a panel of the Fifth Appellate District in following Division Four's reasoning.  (*Howard Jarvis Taxpayers Assn. v. City and County of San*

7

*Francisco* (2021) 60 Cal.App.5th 227 (*Howard Jarvis*); *City of Fresno v. Fresno Building Healthy Communities* (2020) 59 Cal.App.5th 220.)

> 2. Proposition 13's Article XIII A, Section 4 Does Not Impose a Supermajority Requirement on Citizen Initiatives.

Article XIII A, section 4, which was added by Proposition 13, provides that "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." Respondents argued, and the trial court agreed, that Measure AA required a two-thirds vote under this section.

We come to a different conclusion by adopting the rationale of *Proposition C.* In that case, two groups challenged a special tax for homeless services passed by 61 percent of San Francisco voters. (*Proposition C*, *supra*, 51 Cal.App.5th at p. 708.) The court held that section 4 did not constrain the power of voters to approve citizen initiatives by majority vote. (*Proposition C*, at p. 721.) "[W]hen read in harmony with article II's reservation of the initiative power and in light of the evidence of voter intent . . . , article XIII A, section 4 is no[t] . . . ambiguous. . . . '[A]ny doubts with respect to the right of the people to adopt legislation governing taxes through the initiative process should have been laid to rest by . . . *Kennedy Wholesale.*' " (*Ibid.*, quoting *Rossi v. Brown* (1995) 9 Cal.4th 688, 708.) "Section 4 requires governmental entities to gain the approval of a supermajority of voters before imposing a special tax. It does not repeal or otherwise abridge by implication the people's power to raise taxes by initiative, and to do so by majority vote. Any such partial repeal by implication is not favored by the law, which imposes a

duty on courts to jealously guard, liberally construe and resolve all doubts in favor of the exercise of the initiative power." (*Proposition C*, at p. 721.)

In contending that *Proposition C* was wrongly decided, respondents repeat arguments that were raised and rejected in *Proposition C*: that recognizing the voters' right to impose on themselves a special tax through an initiative receiving a simple majority vote is inconsistent with *Kennedy Wholesale* and *California Cannabis*, that two appellate court decisions issued before *California Cannabis* (*City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264 & *Altadena Library Dist. v. Bloodgood* (1987) 192 Cal.App.3d 585) are controlling, and that the common understanding is that Propositions 13 and 218 apply to citizen initiatives. (See *Proposition C*, *supra*, 51 Cal.App.5th at pp. 715–721; see also *Proposition G*, *supra*, 66 Cal.App.5th at pp. 1070–1074 [declining to reconsider *Proposition C* and reaffirming its holdings].) Because we agree with *Proposition C*, we likewise reject these arguments.

> ### 3. Proposition 218's Article XIII C, Section 2, Subdivision (d) Does Not Impose a Supermajority Requirement on Citizen Initiatives.

The trial court also relied on article XIII C, section 2, subdivision (d), added by Proposition 218, in concluding that Measure AA needed a two-thirds vote to pass. This section provides that "[n]o local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." The trial court acknowledged, but declined to extend, *California Cannabis*'s holding, which distinguished initiatives sponsored by local government entities from those sponsored by voters. That case involved article XIII C, section 2, subdivision (b), which was also added by Proposition 218. The section requires that a "local government" sponsored initiative to increase a general

9

tax be submitted to the voters at "a regularly scheduled general election for members of the governing body of the local government." The question in *California Cannabis* was whether a citizen initiative could be placed on the ballot of a special election, instead of a general election. The court concluded that it could, interpreting section 2, subdivision (b)'s reference to "local government" to limit the scope of the section to initiatives sponsored by governmental entities, but not to initiatives sponsored by citizens. (*California Cannabis*, *supra*, 3 Cal.5th at pp. 930–931.) The trial court here believed that *California Cannabis*'s distinction between government- and citizen-sponsored initiatives was limited to section 2, subdivision (b), and did not apply to section 2, subdivision (d). Accordingly, the court ruled that section (2), subdivision (d)'s two-thirds voting requirement applied to citizen initiatives, such as Measure AA.

*Proposition C* rejected this analysis. (*Proposition C*, *supra*, 51 Cal.App.5th at pp. 721–724.) It noted that section 2, subdivision (d), like section 2, subdivision (b), refers to "local government" and contains no indication that it was meant to impose a restriction on the people, as opposed to local government entities. (*Proposition C*, at p. 723.) "[T]he *California Cannabis* court reviewed official ballot materials pertaining to Proposition 218 and found *no evidence* that Proposition 218 was intended to 'rescue voters from measures they might, through a majority vote, impose on themselves.' " (*Id.* at p. 724, quoting *California Cannabis*, *supra*, 3 Cal.5th at p. 940.) Again, we agree with *Proposition C* and reject respondents' arguments that it was wrongly decided. (Accord *Proposition G*, *supra*, 66 Cal.App.5th at p. 1071; *Howard Jarvis*, *supra*, 60 Cal.App.5th at pp. 230–231; *City of Fresno v. Fresno Building Healthy Communities*, *supra*, 59 Cal.App.5th at p. 226.)

10

4. Proposition 218's Article XIII D, Section 3, Subdivision (a)(2) Does Not Impose a Supermajority Requirement on Citizen Initiatives to Add Parcel Taxes That Will Be "Assessed" on Property Owners.

The trial court also concluded that a different provision added by Proposition 218—article XIII D, section 3, subdivision (a)(2)—separately mandated a two-thirds vote to pass Measure AA. That section provides that "[n]o tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property" except if it is a "special tax receiving a two-thirds vote." The trial court concluded that this provision applied to Measure AA because it would require the City to "assess" a parcel tax. *Proposition G* rejected this interpretation of section 3, subdivision (a)(2) (*Proposition G*, *supra*, 66 Cal.App.5th at pp. 1074–1075), and we agree with its reasoning.

As did the trial court in considering Measure AA, the party who challenged the parcel tax in *Proposition G* maintained that article XIII D, section 3, subdivision (a)(2) imposes a two-thirds vote requirement for any tax that is "assessed by any agency," and is thus distinguishable from taxes that may be "imposed" by citizen initiative. (*Proposition G*, *supra*, 66 Cal.App.5th at pp. 1065, 1074–1075.) Specifically, the challenger argued that "because this constitutional provision uses the word ' "*assessed*" ' " the two-thirds vote threshold applies because local agencies are barred "from collecting a special tax, even one proposed by a citizens' initiative, unless the tax has been approved by a two-thirds vote." (*Id.* at p. 1075.)

Respondents here likewise contend that there is a "critical distinction" between the "assessment" and the "imposition" of a tax because an "assessment" involves administrative actions beyond merely legislating a tax increase. *Proposition G* rejected this interpretation because Proposition 218 defines "[a]ssessment" as "*any levy or charge* upon real property by an agency for a special benefit conferred upon the real property." (Art. XIII D, § 2,

11

subd. (b), italics added; *Proposition G, supra*, 66 Cal.App.5th at p. 1075.) Because the article did not adopt a technical definition of "assessment," the court looked to the word's ordinary meaning:  "Pursuant to one dictionary definition, 'assess' means 'to subject to a tax, charge, or levy,' or 'to impose (as a tax) according to an established rate.'  (See Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 69.)  With this definition equating 'assess' and 'impose,' [any] 'critical' distinction evaporates."  (*Proposition G*, at p. 1075.)

*Proposition G* emphasized, as had previous courts analyzing Propositions 13 and 218's effect on the initiative power, that "nothing in the text of article XIII D or its context supports the conclusion that article XIII D, section 3(a) constrains the initiative power. . . . 'Without a direct reference in the text of a provision—or a similarly clear, unambiguous indication that it was within the ambit of a provision's purpose to constrain the people's initiative power—we will not construe a provision as imposing such a limitation.' "  (*Proposition G, supra*, 66 Cal.App.5th at p. 1076, quoting *California Cannabis, supra*, 3 Cal.5th at p. 931.)  We agree with and adopt *Proposition G*'s analysis.

5. Measure AA Is an Authorized Special Parcel Tax.

Finally, we reject an alternate ground for affirmance that respondents raise for the first time on appeal.  They contend that if we accept the City's arguments that Proposition 13's article XIII A, section 4 and Proposition 218's article XIII D, section 3, subdivision (a) do not apply to taxes proposed by citizen initiative, it follows that "the voters cannot enact a flat special parcel tax *at all*" because such a tax would be a constitutionally impermissible non-ad valorem property tax.  This argument was also raised, and rejected, in *Proposition G*, and we once again adopt the court's reasoning.  (*Proposition G, supra*, 66 Cal.App.5th at pp. 1076–1078.)

12

The California Constitution provides that "[a]ll property is taxable and shall be assessed at the same percentage of fair market value" or an authorized standard other than fair market value. (Art. XIII, § 1, subd. (a).) "This provision establishes the general rule that property taxes in California must be ad valorem," at least when they are "general" taxes to be used for general governmental purposes. (*Proposition G*, *supra*, 66 Cal.App.5th at p. 1076; *City of Oakland v. Digre* (1988) 205 Cal.App.3d 99, 110.) Before Proposition 13, "the only mode of property taxation extant in California was the ad valorem property tax." (*Valley Baptist Church v. City of San Rafael* (2021) 61 Cal.App.5th 401, 417.) "Following the passage of Proposition 13, a new type of constitutionally authorized property-related taxation was recognized–the non-ad valorem special property tax." (*Id.* at p. 419; see also *Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 483 [special parcel tax was non-ad valorem and thus not prohibited by Proposition 13]; accord, *Borikas v. Alameda Unified School Dist.* (2013) 214 Cal.App.4th 135, 158, fn. 27 [Proposition 13 does not prohibit non-ad valorem special tax].)

Like Measure AA, the tax at issue in *Proposition G* "impose[d] a flat annual tax on each parcel of real estate in San Francisco without regard to the value of the property, and so [wa]s not an ad valorem tax; it [wa]s a parcel tax." (*Proposition G, supra*, 66 Cal.App.5th at p. 1076.) Propositions 13 and 218 both expressly permit the approval of a parcel tax as a "special tax" earmarked for a special purpose if approved by two-thirds of the electorate. (Arts. XIII A, § 4 & XIII D, § 3, subd. (a)(2); *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1308 [Proposition 218]; *City of Oakland v. Digre, supra*, 205 Cal.App.3d at p. 104 [Proposition 13].) Proposition 218 specified that such a special tax could be assessed "upon a[] parcel of property." (Art. XIII D, § 3, subd. (a)(2).)

13

Like respondents here, the party challenging the parcel tax in *Proposition G* argued that if Propositions 13 and 218 did not apply to citizen initiatives, then the tax was prohibited under article XIII, section 1 because it was not an ad valorem tax.  (*Proposition G*, *supra*, 66 Cal.App.5th at p. 1076.)  The court rejected this argument, holding that article XIII, section 1 does not apply to special parcel taxes enacted by citizen initiative.  "[The challenger] relies on precedents that construe article XIII, section 1 to prohibit a parcel tax that is a general tax [citations], ignoring cases in which a parcel tax that is a special tax survives constitutional challenge."  (*Proposition G*, at p. 1076.)  After recognizing that prior reported cases involved initiatives approved by a two-thirds vote, the court pointed out that the initiatives in those cases were initiated by local government entities (which are restricted by Proposition 218), not by citizens (who are not).  (*Proposition G*, at p. 1077.)

*Proposition G* explained that the constitutional analysis differs for citizen initiatives.  "[T]he constitutional provisions [that those prior reported] cases construe must also be harmonized with the initiative power reserved to the people in articles II and IV.  [Citation.]  We know that 'the people's power to propose and adopt initiatives is at least as broad as the legislative power wielded by the Legislature and local governments.'  (*California Cannabis*, *supra*, 3 Cal.5th at p. 935.)  Moreover, 'procedural requirements imposed on the Legislature and local governments do not similarly constrain the electorate's initiative power without evidence that such was their intended purpose.'  (*Ibid*.)  Although 'neither the Legislature nor the voters may enact a law of a nature that exceeds a limitation on the state's lawmaking power, such as the right of free speech,' the electorate need 'not generally follow "legislative" procedures when exercising the initiative power.'  (*Kennedy*

14

*Wholesale*, *supra*, 53 Cal.3d at p. 252 & fn. 5.)  Such legislative procedures, superfluous to the initiative process, include the requirement for a two-thirds vote.  (*California Cannabis*, *supra*, 3 Cal.5th at p. 942; [citation].)  Thus, just as article XIII, section 1 does not prohibit a local government from adopting a special parcel tax with voter approval, so it cannot prevent the people, exercising their initiative power, from adopting an identical tax." (*Proposition G*, *supra*, 66 Cal.App.5th at pp. 1077–1078.)

*Proposition G* harmonized its conclusion with the purposes of Propositions 13 and 218, stating that to conclude that parcel taxes could be put forth by local governments but not the electorate "would be to construe Proposition 13 and Proposition 218 as having *expanded* local government's authority to tax property. . . . [Article XIII A,] section 4 'was intended to circumscribe the taxing power of local government.'  [Citation.]  And when California voters subsequently passed Proposition 62, we added to the Government Code this directive:  'Article XIII A . . . shall [not] be construed to authorize any local government or district to impose any general or special tax which it is not otherwise authorized to impose.'  (Gov. Code, § 53727, subd. (a).)  [The challenger's] construction of article XIII, section 1, as prohibiting parcel taxes even when they are framed as special taxes, creates a conflict with this directive."  (*Proposition G*, *supra*, 66 Cal.App.5th at p. 1078.)

In short, *Proposition G* stands for the proposition that the people have retained their power to enact by a majority vote citizen initiatives for non-ad valorem special taxes.  Because we agree with *Proposition G* and adopt its reasoning, we reject respondents' argument.

*B. Enacting Measure AA on a Majority Vote Despite Different Statements in Ballot Materials Did Not Violate Due Process or Amount to a Fraud on Voters.*

Having agreed with the City that Measure AA needed only a majority of the vote to pass, we turn to consider respondents' alternative argument that, in light of the ballot materials' statements that the measure needed two-thirds of the vote to pass, the City Council's resolution declaring that the measure passed with only a majority vote was an "about face [that] violate[d] due process." (Capitalization modified.) While we acknowledge the critical importance of true and impartial ballot materials, we cannot conclude there was a due process violation under the circumstances surrounding Measure AA. The ballot materials' statements were not alleged to be intentionally misleading and were made when the governing law was uncertain. The statements cannot supplant the constitutional standards governing an election's voting threshold. If they could, government officials who prepare ballot materials would yield too much power to control the outcome of elections. A measure needing a majority vote cannot be invalidated after receiving such a vote simply because its ballot materials incorrectly identify a higher voting threshold, just as a measure needing a

16

supermajority vote cannot be enacted by a majority vote simply because its ballot materials incorrectly identify the lower voting threshold.[4]

Respondents' arguments can be viewed in two ways. By maintaining that the City Council was obligated to enforce the ballot materials' two-thirds voting-threshold statements even if those statements were wrong, the arguments suggest a postelection challenge to the accuracy of the ballot materials. And by maintaining that the City Council was bound by the ballot materials' voting-threshold statements regardless of their accuracy, the arguments suggest a direct challenge to the council's postelection conduct. Either way, we are unpersuaded.

                1. Measure AA Cannot Be Invalidated Under Due Process Principles on the Basis that the Ballot Materials Were Inaccurate.

As we have said, voters are entitled to be given a true and impartial summary of initiative measures, one that is "not argumentative or likely to create prejudice for or against the measure." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243; see Elec. Code, §§ 9280 [City Attorney must "prepare an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure"], 9051, subd. (c) [under § 10403, subd. (a)(2), city

---

    [4] When questioned at oral argument whether it was respondents' position that a measure needing a supermajority vote could be enacted by a majority vote simply because its ballot materials incorrectly identified the lower voting threshold, respondents' counsel stated that such ballot materials would be subject to a preelection challenge. In response, the City's counsel pointed out that no such preelection challenges were made to the ballot materials accompanying San Francisco's propositions that were the subject of *Proposition C*, *Proposition G*, and *Howard Jarvis* (*post*, fn. 6). In none of those cases did the courts rely on the ballot materials' statements that the measures needed a majority vote to pass as independent reasons to enforce the measures as valid enactments.

17

must "give a true and impartial statement of the purpose of the measure in such language that the ballot title and summary shall neither be an argument, nor be likely to create prejudice, for or against the proposed measure"]; Oakland Mun. Code, § 3.08.200.)  "The main purpose of these requirements is to avoid misleading the public with inaccurate information." (*Amador Valley*, at p. 243.)

"Generally, a challenge to ballot materials must be made before an election.  Indeed, a postelection challenge to ballot materials is not permitted by the Elections Code." (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 123 (*Owens*).)  Here, however, respondents' postelection challenge to prevent the enforcement on Measure AA is grounded on the ballot materials' statements.  The provisions of the Elections Code "do [not] provide a statutory bases 'to attack the outcome of an election based on deficiencies in the impartial analysis' of a ballot measure after the election," as "[e]nforcing the requirements for an impartial analysis of a ballot is a preelection activity." (*Denny v. Arntz* (2020) 55 Cal.App.5th 914, 921; accord, *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 192.)

While postelection challenges to ballot materials cannot be brought under the Elections Code, "California appellate courts have recognized the 'possibility' that an impartial analysis of a county measure or other ballot materials can be so misleading and inaccurate 'that constitutional due process requires invalidation of the election.' " (*Owens, supra*, 220 Cal.App.4th at p. 123.)  At the same time, "courts have set a 'very high' bar [citation] for litigants to successfully mount" such a challenge.  (*Ibid*.) Indeed, *Owens* noted that "no California appellate court, to our knowledge, has invalidated an election on this basis." (*Ibid*.)  This high bar is "for good reason. . . . 'California law makes it hard to overturn elections.  The reasons

18

are fundamental. Voters, not judges, mainly run our democracy. It would threaten that core tenet if one person who did not like the election result could hire lawyers and with ease could invalidate an expression of popular will.'" (*Id.* at pp. 123–124.) The "idea that by 'constitutionalizing' deficiencies in voter summaries you can undo an election is really quite antithetical to the democratic process." (*People ex rel. Kerr v. County of Orange* (2003) 106 Cal.App.4th 914, 933.)

Thus, evaluating "how much process is due in a local, direct decisionmaking context—where the complained-of irregularities consist of omissions, inaccuracies or misleading statements in the ballot materials—will depend on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for or against the measure, will also bear on whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the omission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters." (*Horwath v. East Palo Alto* (1989) 212 Cal.App.3d 766, 777–778 (*Horwath*).)

In *Horwath*, a city attorney failed to prepare an impartial analysis of a proposed rent-stabilization ordinance by not discussing a rent rollback that would go into effect upon the measure's enactment. (*Horwath*, *supra*, 212 Cal.App.3d at pp. 770–772.) After the measure passed, landlords sought

19

a writ of mandate barring its enforcement. (*Id.* at pp. 769, 771.) In rejecting the owners' challenge, *Horwath* held that a successful challenge to the measure would require an elector to show that " 'the result would have been different without [the wrongful] influence—i.e., [the misinformation] prevented the expression of the majority will.' " (*Id.* at pp. 774–775.) According to the court, the landlords could not bring such a challenge because they were not electors of the city that enacted the measure and had not "offered any proof that the deficient impartial analysis in fact affected the outcome of the vote." (*Id.* at p. 775.) After finding that the failure to disclose the rent rollback "f[ell] somewhere in between a minimal defect and one going to the core character and purpose of the proposed legislation," the court concluded that the impartial analysis "was [not] so egregious as to raise a presumption of unfairness," since other information about the ordinance had been properly disclosed, there had been preelection publicity about the rollback, and the full text of the proposed ordinance had been available. (*Id.* at p. 779.) The court held that the owners had failed as a matter of law to establish a constitutional violation. (*Ibid.*)

In advancing their due process argument here, respondents do not analyze the *Horwath* factors.[5] They insist that *Horwath* was a "fundamentally different case[]" because it involved "a sin of *omission*" instead of "a sin of *commission*." We see this as a difference without a

---

[5] Instead, they rely on two federal cases that involved challenges to the handling of absentee ballots. (*Roe v. Alabama* (11th Cir. 1995) 43 F.3d 574, 583 [certifying question to state supreme court about state law affecting absentee ballots without deciding constitutional question]; *Griffin v. Burns* (1st Cir. 1978) 570 F.2d 1065, 1076 [where state supreme court ruled that absentee ballots were not permitted in primary elections and invalidated votes of people told they were permitted to vote absentee, "the election itself becomes a flawed process"].)

distinction. Respondents' due process argument is based on the premise that the ballot materials were inaccurate, and respondents have offered nothing to explain why the way in which the inaccuracy arose—by failing to include a point as occurred in *Horwath* or by including an inaccurate point as occurred here—affects the analysis.

We therefore apply the *Horwath* factors and conclude that Measure AA cannot be invalidated on due process grounds. To begin with, other than the voting-threshold statements, Measure AA's ballot materials provided extensive, and unchallenged, information about the substantive content and effect of the measure. Voters were informed that 62 percent of the tax would be used to expand access to early childcare and education, 31 percent would be used to "reduce disparities in postsecondary education outcomes," and seven percent would be used for oversight and accountability costs established by the measure. Voters were also informed that a new accountability officer would be added to City staff to oversee programs funded by Measure AA, and they were provided with a description of the officer's job responsibilities and authority. And they were informed that the tax would generate around $30 million in revenue each year, would be imposed through fiscal year 2048–2049, could be increased by the City Council on certain criteria, and would include exemptions for some low-income and other qualifying households. In short, it is undisputed that voters were given true and impartial information about the substance of the proposed tax and how and where the proceeds would be distributed. In contrast, the ballot materials' voting-threshold statements did not strike "at the very nature and purpose of the legislation" but concerned an important, but "more ancillary matter[]." (*Horwath, supra,* 212 Cal.App.3d at pp. 777–778.)

21

Furthermore, the ballot materials' voting-threshold statements were made when there was legal uncertainty about the applicable voting threshold for citizen's initiatives for special parcel taxes. Respondents themselves acknowledge that "Proposition 13 is one of the most litigated (non-criminal) laws in California." And in recent years, cities facing citizen-initiated tax initiatives have not had a clear-cut answer on the governing vote threshold. (See, e.g., *California Cannabis*, *supra*, 3 Cal.5th at p. 956 (dis. opn. of Kruger, J.) [noting that majority's opinion could be construed to mean that "from here on out, special taxes can be enacted by a simple majority of the electorate"].) Not surprisingly, cities have taken different positions on the voting threshold needed for citizen-initiated tax measures. On one hand, for example, Fresno's city council referred to a two-thirds vote threshold in its resolution placing a citizen tax initiative before the voters in November 2018, though the city took a neutral position in proceedings to implement the measure "and indicated it would defer to the court's guidance." (*City of Fresno v. Fresno Building Healthy Communities*, *supra*, 59 Cal.App.5th at pp. 229–230.) In San Diego, the San Diego City Attorney advised voters that a two-thirds vote was necessary for a citizen-initiative hotel tax placed on the March 2020 ballot. On the other hand, the ballot materials sent to San Francisco voters regarding the taxes at issue in *Proposition G* and *Howard Jarvis* (in advance of the June 2018 election), and *Proposition C* (in advance of the November 2018 election) stated the measures required a simple majority to pass.[6] (*Proposition G*, *supra*, 66 Cal.App.5th at p. 1065; *Howard*

---

[6] Respondents' unopposed request for judicial notice of the San Diego ballot materials is granted. On its own motion, the court takes judicial notice of the San Francisco ballot materials after having provided the parties notice and an opportunity to object, which no party did. (Evid. Code, §§ 455, subd. (a), 459, subd. (c).)

*Jarvis, supra*, 60 Cal.App.5th at p. 231; *Proposition C, supra*, 51 Cal.App.5th at p. 708.)  Given this uncertainty, we cannot conclude that it was fundamentally unfair for Oakland officials to express in the 2018 ballot materials that Measure AA would require two-third of the vote to pass, then later take a different position.

> ### 2. Measure AA Cannot Be Invalidated as a "Fraud on the Voters."

Respondents more forcefully argue that the City Council's declaration enacting Measure AA on a majority vote when the ballot materials stated that a two-thirds vote would be required amounted to a fraud.  They describe the City Council's action as "game-playing" and "cynically revers[ing] course after the fact."  And they characterize the City's position that it did not engage in fraud as "astonishing," "astounding," and "wholly undemocratic." While we agree that the ballot materials' incorrect voting statements were lamentable, we cannot agree that respondents sufficiently alleged fraud by the City.

As did the trial court, respondents rely on the 1956 case of *Hass v. City Council, supra*, 139 Cal.App.2d 73, which includes forceful, yet ultimately undefined and unhelpful, language, and is distinguishable.  In *Hass*, the Palm Springs City Council held a special election for an ordinance to change the boundary lines for council districts.  (*Id.* at p. 74.)  Both the ballot *and the proposed ordinance itself* stated that the redistricting would proceed if three-fourths of voters voted in favor of the ordinance.  (*Id.* at pp. 74–75.)  Because the ordinance received a majority, but less than three-fourths, vote, the city council declared that the ordinance had failed.  (*Id.* at p. 75.)  Three appellants sued to have the city council nonetheless adopt the ordinance, but the trial court and the appellate court rejected their claims.  (*Ibid.*)

The appellants in *Hass* argued that the ordinance was legally adopted by a majority vote because state law did not compel a three-fourths vote for redistricting. (*Hass v. City Council*, *supra*, 139 Cal.App.2d at p. 75.) But the appellate court concluded that whatever law governed the voting procedure, "it would seem to follow logically and legally that the matter should be submitted to the voters on that basis, or at least that the voters should not be deceived or misled in that respect. After the election has been decided by the voters on the basis of the proposed ordinance submitted to them, the result should not be declared void by the body charged with the duty of canvassing the votes on the ground that a different rule should have been followed and a different proposition submitted." (*Id.* at pp. 75–76.) The voters in *Hass* "were asked to vote on the basis that a three-fourths vote was required, and the result of the election did not meet the requirement set forth in both the proposed ordinance and the ballot." (*Id.* at p. 76.) The court concluded that "[i]t would be a fraud on the voters" to force the adoption of an ordinance after electors "voted upon an ordinance submitted to them *upon a definite condition*," one that was (unlike in this case) requested by the signers of the initiative petition placing the ordinance on the ballot. (*Ibid.*, italics added.) On those facts, *Hass* ruled that the trial court properly exercised its discretion in denying the appellants their request to implement the redistricting ordinance. (*Id.* at pp. 76–77.) The case does not, as respondents claim, stand for the broad principle that a proposition "will not be considered adopted" if it passes by a smaller majority than what was stated in ballot materials.

Respondents point out that *Hass* observed that "[i]t may well be that many voters who were not entirely convinced as to the wisdom of adopting that [council redistricting] ordinance were willing to agree to it in the event

24

that three fourths of the voters desired to make that change." (*Hass v. City Council, supra*, 139 Cal.App.2d at p. 76.) This conjecture has less relevance here because Measure AA, unlike the measure in *Hass*, did not include a voting threshold in its text. But even accepting that incorrect statements in ballot materials might affect some voters, we disagree that this possibility rendered the enactment of Measure AA a fraud on the voters.

Respondents discount the fact that in *Hass* the voting threshold was in the text of the proposed ordinance and not just, as here, in the ballot materials.[7] We presume that voters are familiar with the language of a proposed ordinance, "have duly considered it, and have voted intelligently." (*Monette-Shaw v. San Francisco Bd. of Supervisors* (2006) 139 Cal.App.4th 1210, 1219.) A voting threshold identified in ballot materials cannot supplant the law governing the applicable voting threshold, while a voting threshold expressed in a measure itself *establishes* the applicable law for that measure.

Respondents asked the trial court to rule *as a matter of law* that the City Council's action declaring Measure AA enacted on a majority vote amounted to a fraud on voters. *Hass* did not define the phrase "fraud on the voters," but fraud generally requires an intentional misrepresentation. The "actual fraud" necessary to set aside a contract, for example, is defined as "[t]he suggestion, as a fact, of that which is not true, *by one who does not believe it to be true.*" (Civ. Code, § 1572, subd. 1, italics added.) The cases cited by respondents all involve such verifiably untrue statements. (*Peery v.*

---

[7] We are aware of only two published cases that cite *Hass*, and one of them distinguished it on the basis that the initiative in *Hass* contained "*express language* . . . which required approval by three-fourths of the voters." (*Santa Barbara County Taxpayer Assn. v. Board of Supervisors* (1989) 209 Cal.App.3d 940, 948, italics added.)

*City of Los Angeles* (1922) 187 Cal. 753, 769 ["fraud would be wrought" if city were to dispose of bond issues at less than value approved by voters, which was "one of the essential conditions upon which" the bond issues were obtained]; *Skinner v. City of Santa Rosa* (1895) 107 Cal. 464, 476–477 [enjoining sale of bonds on terms that did not substantially comply with those voted on]; *San Francisco Forty-Niners v. Nishioka* (1999) 75 Cal.App.4th 637, 639 [prohibiting the qualification of an initiative measure for ballot where initiative petition contained "objectively inaccurate information and calculated untruths that substantially mislead and misinform a reasonable voter"]; *Concerned Citizens v. City of Carlsbad* (1988) 204 Cal.App.3d 937, 940, 943 [upholding the refusal to enact proposition that received fewer votes than competing proposition where measure specifically stated that the one receiving more votes "shall prevail"; to hold otherwise "would disenfranchise all those Carlsbad residents who voted for both propositions on the premise that only one would be enacted"].)

By contrast, the voting-threshold statements in Measure AA's ballot materials must be viewed in a context of an evolving legal landscape surrounding citizens' initiatives for special parcel taxes. While the City Attorney and Auditor were incorrect in stating in the ballot materials that Measure AA required two-thirds of the vote, respondents did not allege that these officials acted with a fraudulent intent, nor can we ascribe such an intent to them. (See *Orcilla v. Big Sur, Inc.* (2016) 244 Cal.App.4th 982, 1008 [elements of fraud, including the intent to induce reliance on a known falsity, must be plead with specificity].)

*C. Respondents Have Not Stated a Cause of Action for Estoppel.*

Having concluded that Measure AA required only a majority vote to pass and that the City Council's declaration that it passed did not violate due

26

process principles or amount to a fraud on the voters, we turn to the appropriate disposition. We essentially have found that the trial court erred in granting respondents' motion for judgment on the pleadings. But the trial court also *denied* the City's motion for judgment on the pleadings. In doing so, it concluded that respondents had adequately alleged a cause of action for equitable estoppel. We disagree that Measure AA can be invalidated on such a theory.

Respondents' complaint alleged that the City is estopped from arguing that a majority voting threshold governs because of the two-thirds voting-threshold statements contained in the ballot materials. On appeal, they renew this theory, arguing that the City is estopped from challenging the two-thirds voting-threshold statements because it failed to challenge the statements before the election.[8]

True enough, parties may not seek to *invalidate* an election by raising alleged errors that could have been addressed beforehand. (E.g., *McKinney v. Superior Court* (2004) 124 Cal.App.4th 951, 954 [challenge to eligibility of write-in candidate should have been brought before the election]; *Kilbourne v. City of Carpinteria* (1976) 56 Cal.App.3d 11, 12–13, 16–17 & fn. 1 [city councilmember whose surname was missing one letter on ballot could not

---

[8] The trial court took a different approach. It concluded that respondents adequately alleged that they detrimentally relied on the ballot materials prepared by the City Attorney: "Specifically, [respondents] allege that if they had known the City would later contend (contrary to the information contained in the ballot materials prepared by the City Attorney) that Measure AA only needed a simple majority vote to pass, [respondents] would have had a pre-election remedy to challenge any such statements in the voting materials." But even if this were true, it does not follow that respondents can pursue this cause of action in the context of an election contest because it is impossible to know whether any preelection challenge would have been successful given the legal uncertainty we have highlighted.

invalidate results on that basis where preelection remedies existed; in dicta, court said estoppel would bar relief since candidate "knew or should have known of the error" in sufficient time to have it corrected].)  But here, the City is attempting to do the opposite:  it is defending against an effort to invalidate a measure that received nearly 63 percent of the vote.

Again, the vote threshold required to pass a special parcel tax was legally uncertain at the time Measure AA was presented to voters.  To invalidate an otherwise lawfully passed measure would apply "the 'fundamentally undemocratic nature of the requirement for an extraordinary majority' " (*Proposition C*, *supra*, 51 Cal.App.5th at p. 718) simply because local government officials included statements identifying the wrong voting threshold in the ballot materials.  Respondents do not otherwise list the elements of a cause of action for estoppel or explain why it should apply in an election contest.  We conclude under these circumstances that respondents' estoppel cause of action fails as a matter of law, and the trial court therefore should have granted the City's motion for judgment on the pleadings.

## III.
### DISPOSITION

Respondents' unopposed request for judicial notice filed on December 2, 2020, is granted.

The judgment is reversed.  The trial court is directed to enter a new order denying respondents' motion for judgment on the pleadings and granting the City's motion for judgment on the pleadings.  Appellant City of Oakland shall recover its costs on appeal.

_____
Humes, P.J.

I CONCUR:


_____
Sanchez, J.




*Jobs & Housing et al. v. City of Oakland*  A158977

*Jobs & Housing et al. v. City of Oakland*  A158977

**CONCURRENCE OF BANKE, J.**

I concur in the disposition.  The outcome in this case and other recent cases holding citizen initiative tax measures are not subject to the requirements of Proposition 13 and Proposition 218—*City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, *Howard Jarvis Taxpayers Assn. v. City and County of San Francisco* (2021) 60 Cal.App.5th 227, *City and County of San Francisco v. All Persons Interested in the Matter of Proposition C* (2020) 51 Cal.App.5th 703, *City of Fresno v. Fresno Building Healthy Communities* (2020) 58 Cal.App.5th 884—is compelled by our Supreme Court's decisions in *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, *Rossi v. Brown* (1995) 9 Cal.4th 688, and *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245.  Under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, we must, of course, follow the high court's rulings undergirding its decisions in these cases.  I nevertheless share the concerns voiced by Justice Kruger in her concurring and dissenting opinion in *California Cannabis Coalition,* in which Justice Liu concurred.  It has come to pass, as Justice Kruger predicted, that "[i]f a local tax enacted by voter initiative is not a tax 'impose[d]' by 'local government,' " as the majority held, "then from here on out, special taxes can be enacted by a simple majority of the electorate, as long as proponents can muster the necessary quantum of support to require" placement on the ballot.  (*California Cannabis Coalition,* at p. 956 (conc. & dis. opn. of Kruger, J.).)

 

 

 

_____

Banke, J.

1

Trial Court:        Alameda County

Trial Judge:        Hon. Ronni MacLaren

Counsel:

Barbara J. Parker, City Attorney, Maria Bee, Assistant City Attorney, Jennifer Logue, Supervising City Attorney; Hanson Bridgett LLP, Adam W. Hofmann and David C. Casarrubias for Defendant and Appellant.

Olson Remcho, LLP, James C. Harrison, Karen Getman and Omar El-Qoulaq for Jorge Lerma and George Holland, Sr. as Amicus Curiae on behalf of Defendant and Appellant.

Nielsen Merksamer Parrinello Gross & Leoni LLP, James R. Parrinello and Christopher E. Skinnell for Plaintiffs and Respondents.

Eversheds Sutherland (US) LLP, Timothy A. Gustafson, Eric J. Coffill and Alexandra Louderback for Council on State Taxation as Amicus Curiae on behalf of Plaintiffs and Respondent.